**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **REFINED TECHNOLOGIES, INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO. _____** |
| **vs.** | § | |
| | § | |
| **USA DEBUSK LLC; BLAKE** | § | |
| **MONTGOMERY; KYLE** | § | |
| **WILLIAMS; and RYAN ULFERTS** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT FOR
<u>PATENT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION</u>**

Plaintiff Refined Technologies, Inc. ("Plaintiff" or "Refined Technologies") files this Original Complaint for Patent Infringement and Trade Secret Misappropriation, with jury demand, against Defendants USA DeBusk LLC ("DeBusk"), Blake Montgomery, Kyle Williams, and Ryan Ulferts (collectively, "Defendants"). Plaintiff alleges infringement of United States Patent No. 9,017,488 ("the '488 Patent") and trade secret misappropriation under the Defend Trade Secrets Act and the Texas Uniform Trade Secret Act, as follows:

<u>**PARTIES**</u>

1.    Plaintiff is a Delaware corporation with its principal place of business at 480 Wildwood Forest Dr., Suite 400, Spring, Texas 77388.

1

2.      DeBusk is a limited liability company organized and existing under the laws of the State of Texas, with a principal place of business at 1005 W 8th Street, Deer Park, Texas 77536.  DeBusk also maintains a regular and established place of business and does business in the Galveston Division, *inter alia*, at 919 S. Shanks Street, Clute, Texas 77531.

3.      Blake Montgomery is an individual and, on information and belief, has a place of residence at 6905 Evangeline Drive, Lumberton, Texas 77657.

4.      Kyle Williams is an individual and, on information and belief, has a place of residence at 1204 Merriewood, Friendswood, Texas 77546.

5.      Ryan Ulferts is an individual and, on information and belief, has a place of residence at 528 Flock Avenue, Naperville, Illinois 60565.

## JURISDICTION AND VENUE

6.      This action arises under the under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*., the Defend Trade Secret Act of 2016, 18 U.S.C. §§ 1836, et seq. ("DTSA"); and the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.001.

7.      This Court has subject matter jurisdiction for the patent infringement claim pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has subject has subject matter jurisdiction over this action for the misappropriation of trade secrets under the DTSA pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because such claims are related to the federal claims

for misappropriation of trade secrets and patent infringement in that they form part of the same case or controversy and are derived from a common nucleus of operative facts.

8.    This Court has personal jurisdiction over DeBusk because it is a company having its principal place of business in this district, because it regularly transacts business in this district and throughout Texas, and on information and belief, because it has committed acts within the District giving rise to this action—specifically, sale and use of methods infringing the '488 Patent and misappropriation of Refined Technologies' trade secrets.

9.    This Court has personal jurisdiction over Defendants Montgomery and Williams because, *inter alia*, both are residents of Texas. In addition, Montgomery's and Williams' tortious acts of misappropriating Refined Technologies' trade secret information occurred within the state of Texas. Accordingly, Montgomery's and Williams' tortious acts giving rise to this lawsuit and the harm to Refined Technologies have occurred and will continue to occur within Texas.

10.    This Court has personal jurisdiction over Defendant Ulferts at least because Ulferts signed an employment agreement governing the provision and non-disclosure of the confidential trade secret information at issue in this case, wherein Ulferts expressly consented to the personal jurisdiction of this Court for any lawsuit related to the agreement. Further, Ulferts received access to trade secret information at least in part while working for Refined Technologies while physically present in Texas, and on information and belief committed acts directed at Texas that have caused tortious injury to Refined Technologies in Texas, specifically, misappropriation of Refined Technologies' trade secret information,

with the knowledge that Refined Technologies would thereby be harmed. Accordingly, Ulferts' tortious acts giving rise to this lawsuit have at least been directed at Texas and the harm to Refined Technologies have occurred and will continue to occur within Texas.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1291 and § 1400(b) because DeBusk maintains a principal place of business in this District. Further, on information and belief, DeBusk has committed acts of infringement of the '488 Patent within this District by using, selling, and/or offering for sale the claimed methods of the asserted patents. DeBusk further maintains a regular and established places of business in this District, including but not limited to its principal place of business. Further, on information and belief, a substantial part of the events giving rise to the trade secret misappropriation claims occurred within this district. This includes, but is not limited to, DeBusk's receipt of trade secret information from defendants Montgomery, Williams, and Ulferts (collectively, the "Individual Defendants"), as well as the use of Refined Technologies' trade secrets while preparing bids for work to be performed, and planning and performing work, both inside and outside this district.

## **BACKGROUND**

### A.    **Refined Technologies**

12.    Refined Technologies is a Houston-based company that specializes in cleaning refineries and chemical plants with its patented cleaning services and products. Refined Technologies has 14 offices in the U.S. and Canada, and regional offices in Europe and Asia. Refined Technologies employs over 250 individuals and provides plant cleaning

4

services for over 125 facilities throughout the world. Refined Technologies is a company that invests substantial resources in innovation and the protection of its valuable intellectual property. To date, Refined Technologies has eight issued U.S. Patents and five more pending U.S. patent applications.

13.    One of Refined Technologies' areas of expertise and service offerings is in decontaminating reactor systems that contain catalysts in refineries and chemical plants. A catalyst After extended use, a reactor will have to be shut down for a period of time so that maintenance work, inspection, and catalyst-handling activities can be conducted. That period is called a "turnaround." Traditional reactor decontamination processes use hydrogen and nitrogen gases to clear, cool, and degas the reactor. This gas sweeping process can leave behind high amounts of noxious gases, like benzene, hydrogen sulfide, and other lower explosive limit gases ("LELs"). Even when this process does work to eliminate LELs, it can take a very long time. The primary way to remove left-over noxious gases out of a reactor typically involves two steps. First, following the cessation of product feed into the vessel (toward the beginning of the shutdown process), hydrogen gas is heated and swept or pushed through the reactor to remove hydrocarbons from the reactor catalyst. Then, after the unit has been swept and cooled, nitrogen gas is swept through the reactor to purge the noxious gases left in the reactor. That process is called a nitrogen purge and occurs towards the end of the shutdown process. The hot hydrogen strip and nitrogen purge add a substantial amount of time to the cleanup process, prolonging the plant shutdown. Plants want to minimize the time of the turnaround because it is costly. The plant cannot process materials during the turnaround.

14.    Refined Technologies offers a patented process to eliminate the hot hydrogen strip and nitrogen purge processes, substantially reducing the amount of time a plant is shut down for decontamination. In this process, there is an initial hydrogen gas purge that pushes most of the liquid oil out of the reactor into a cold separator. That step is much shorter than the traditional hot hydrogen strip. Next, Refined Technologies injects a non-aqueous solvent (e.g., Refined Technology's QTRX2® solvent), into the reactor over a short period of time. The injected solvent is vaporized, typically in a heater located ahead the reactor, before it enters the reactor. The vapors then contact the catalyst in the reactor and remove liquid hydrocarbons on the surfaces of the catalyst. That process frees trapped noxious gases from the catalyst. The vaporized QTRX2, freed liquid hydrocarbons, and freed noxious gases are then swept out of the reactor by hydrogen. In a cold separator downstream of the reactor, the QTRX2 is condensed to a liquid and removed with the liquid hydrocarbons, while the noxious gases are separately removed directly from the reactor through the purge. Finally, hydrogen is used to cool down the reactor, and then nitrogen is used to depressurize and re-pressurize the system, readying the reactor for plant maintenance. Refined Technology's patented process is much shorter than the traditional hot hydrogen strip and nitrogen purge processes.

15.    While refining and perfecting the application of its patented reactor decontamination process to various refinery and plant units, Refined Technologies has developed related trade secrets and facilitative process. This proprietary information is necessary to achieve the highest levels of performance that reflect Refined Technologies' reputation for excellence in the industry. Accordingly, Refined Technologies has

undertaken substantial efforts to keep this information confidential, in light of the potential value of the information to industry competitors. This confidential and proprietary trade secret information includes, but is not limited to: sourcing of raw materials; appropriate lab testing methods to validate formulas; criteria for inspecting raw materials prior to blending; compatibility and stability testing methods; distillation and mass balance properties; dosing strategies for determining how much solvent to be used for specific types of equipment; methods for most efficiently performing the steps described in the claims of the '488 Patent; client lists and client contacts; client contract strategy, and sales and pricing strategy.

## United States Patent Number 9,017,488

16.     As mentioned, Refined Technologies has applied for and obtained patents covering its process, including the '488 Patent.

17.     On April 28, 2015, the U.S. Patent and Trademark Office duly and legally issued U.S. Patent No. 9,017,488 titled, "Process for Removing Hydrocarbons and Noxious Gasses from Reactors and Media-Packed Equipment." A true and correct copy of the '488 Patent is attached as Exhibit A.

18.     The '488 Patent was filed on July 16, 2014 as patent application serial number 14/333,381 and was published as United States Patent Application Publication US 2014/0326141 A1 on November 6, 2014.

19.    The '488 Patent is a continuation of patent application serial number 13/936,807, which is a continuation-in-part of application No. 12/478,580, now U.S. Patent No. 8,480,812.

20.    The '488 Patent claims patent-eligible subject matter and is valid and enforceable.

21.    The named inventors of the '488 Patent are Cody Nath, Barry Baker, and Sean Sears.

22.    The named inventors conveyed to Refined Technologies all rights, title, and interest in and to the invention of the '488 Patent and its underlying patent applications, including the right to sue and recover for patent infringement, by written assignments recorded in the United States Patent and Trademark Office.

23.    Refined Technologies is the exclusive owner by assignment of all rights, title, and interest in the '488 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present and future damages for infringement of the '488 Patent.

24.    DeBusk has been on notice of the '488 Patent since February 2021, as explained in greater detail with respect to Count 1 below.

**B.    DeBusk's Coordinated Attack on Refined Technologies.**

25.    DeBusk is a Texas company with its principal place of business in Deer Park, Texas. DeBusk touts itself as offering "a full suite of solutions including specialty turnaround services; coker unit services; hydro blasting; hydro cutting; hydro excavation

and vacuuming; unit clearing; chemical cleaning; tank cleaning; emission control; pigging, decoking and filtration; controlled-volume pigging; hot catalyst services; inert catalyst services; and transportation, storage and transloading services." According to its website, DeBusk was founded in 2012.

26.     Recently, DeBusk has begun aggressively targeting Refined Technologies' employees and former employees, seeking to hire them away in support of DeBusk's own operations. DeBusk has also aggressively targeted Refined Technologies' customers. When such competition is above board and conducted without violation of the law, it is of course unobjectionable. Unfortunately, that is not the case here.

27.     Knowing that it could not compete legitimately with Refined Technologies in the marketplace, DeBusk embarked on a coordinated attack. On information and belief, DeBusk has hired at least three of Refined Technologies' former employees having detailed knowledge of Refined Technologies confidential and trade secret information, for the purpose of misappropriating that information and using it to illegally compete with Refined Technologies.

### 1.     Blake Montgomery and Kixmon Solutions

28.     Refined Technologies hired Blake Montgomery in August 2009. Prior to working for Refined Technologies, Mr. Montgomery had no known refinery or chemical decontamination experience. Refined Technologies fully trained Mr. Montgomery in every technical aspect of the business, including but not limited to the confidential and proprietary trade secret information related to implementation of the decontamination

processes described in the '488 Patent. During his tenure with Refined Technologies, Montgomery was promoted and eventually named Senior Technical Director of Operations. As such, Montgomery had access to all Refined Technologies' confidential and proprietary products and methods.

29.    As a condition of his hire, Mr. Montgomery signed an employment agreement on August 3, 2009. This agreement explicitly addressed the receipt and disclosure of confidential trade secret information:

Section 7.    Receipt and disclosure of confidential information.  Employee acknowledges and agrees that because of his/her position with Employer, the nature of his/her duties and responsibilities and the contact he/she has with the clients of Employer, Employee will acquire valuable information and confidential information and trade secrets with respect to Employer's successful business operations. For purposes of this agreement, the term "information" includes, by way of example and not limitation, information relating to research, development, patent and copyright development and licensing thereof; trade secrets including but not limited to QuikTurn®, Super Q®, Permanna®, PetroBlast, Heat Trax®, Vaporganic® process and inventions; formulas, product blending formulas, designs, drawings, specifications and engineering; laboratory analysis; production processes and equipment; marketing techniques, price lists, pricing policies and quoting procedures; database passcodes; financial information; names of clients and their representatives; client's services; computer techniques, programs and software; and the type, quantity and specifications of products purchased or sold by or from client(s) and/or by or from supplier(s).

30.    The agreement further provided that Montgomery was not permitted to use any confidential information for his own purposes or for the purposes of any person other than Refined Technologies, and that Montgomery was obligated to forever maintain the confidentiality of the confidential information:

10

During employment with the Company and thereafter, Employee will not use Confidential Information for his/her own purposes or for the purposes of any person other than the Company and will not disclose Confidential Information to non-Company personnel except as required in connections with his/her duties as an Employee of the Company or with the prior written permission of the Company. Employee agrees to take all reasonable precautions to prevent inadvertent disclosure or use of such Confidential Information. Employee shall forever maintain the confidentiality of such Confidential Information except as to any item or portion thereof that is or becomes publicly known other than through or by him/her. Nothing herein shall preclude Employee from using or disclosing information rightfully disclosed to him/her by a third party not employed by the Company, to the extent allowed by such third party.

31.     Finally, Refined Technologies made it clear to Montgomery that use of any confidential information in violation of the agreement could be damaging to Refined Technologies' business operations, particularly if a competitor were able to use the information:

In addition, Employee understands the importance of his/her obligation of confidentiality to the Company and acknowledges that the use or disclosure of Confidential Information by him/her could be damaging to the Company business operations, particularly if such use or disclosure is by or to a competitor of the Company. If Employee should ever accept employment from, or provide consulting services to, a competitor of the Company, he/she will not use or permit the use of Confidential Information for the benefit of such competitor.

32.     On August 8, 2013, Mr. Montgomery signed a separate confidentiality and noncompete agreement as a result of a promotion. This agreement reiterated Mr. Montgomery's obligations to refrain from the use or disclosure of confidential information.

33.     In addition to his confidentiality obligations, Mr. Montgomery also had binding noncompetition obligations as part of both his employment agreement and subsequent confidentiality and noncompete agreement. Specifically, Mr. Montgomery was forbidden from having any contact for a competitive purpose with any of Refined

Technologies' clients or prospective clients for a two-year period following the termination of his employment with Refined Technologies.

34.     Mr. Montgomery resigned from his position at Refined Technologies on June 5, 2015, purportedly to take a Senior Account Manager position at Baker Hughes. But on on May 19, 2015, *before* resigning his position with Refined Technologies, Montgomery formed Kixmon Solutions, LLC ("Kixmon").

35.     On information and belief, Kixmon and Montgomery almost immediately began competing with Refined Technologies following Montgomery's resignation. In June 2018, Refined Technologies sued Montgomery for misappropriation of trade secrets related to a different patented process than that at issue here (that process was covered by U.S. Patent No. US 6,893,509). Refined Technologies and Montgomery settled that suit in March 2019.

36.     In February 2020, however, Kixmon filed a patent application, designating Montgomery as the inventor, entitled "Catalytic Reactor System Treatment Processes." A continuation of this application was subsequently granted by the U.S. Patent Office, issuing as U.S. Patent No. 10,974,239 ("the '239 Patent"), which is attached hereto as Exhibit B. The '239 Patent describes decontamination methods remarkably similar to those disclosed in the '488 Patent, but having one difference. The '239 Patent purports to "maintain[] the non-aqueous liquid solvent in a liquid state." Crucially, this step—if it were in fact observed—would distinguish the process from the process disclosed in Refined Technologies' '488 Patent, which requires volatilizing (vaporizing) the solvent. However,

on information and belief and as discussed further below, the process described in the '239 Patent cannot be employed without volatilizing all or substantially all the solvent.

37.    On information and belief, Montgomery filed the applications culminating in issuance of the '239 Patent without any testing or experimentation regarding the conditions described therein, and specifically without any testing or experimentation suggesting that the solvent employed would in reality be maintained as a liquid. Instead, on information and belief, Montgomery included the requirement of maintaining the solvent in a liquid state for the purpose of avoiding the claims of Refined Technologies' '488 Patent, and in order to provide cover for subsequent illegal competition with Refined Technologies using Refined Technologies' misappropriated trade secret information and which infringes the '488 Patent, as set forth further below.

38.    According to assignment records available from the U.S. Patent and Trademark Office, Kixmon assigned the '239 Patent (at the time, still an application) to DeBusk on February 24, 2021. This is approximately when DeBusk acquired Kixmon and also when Montgomery became a DeBusk employee. Currently, on information and belief, Montgomery is DeBusk's Vice President of Engineering.

### 2.    Kyle Williams

39.    Refined Technologies hired Kyle Williams in May 2010. Prior to working for Refined Technologies, Williams had experience working in a petroleum refinery, but on information and belief had no significant chemical decontamination experience. As part of his employment, Refined Technologies fully trained Mr. Williams in every operational

aspect of the business, including but not limited to the confidential and proprietary trade secret information related to implementation of the decontamination processes described in the '488 Patent. Williams ultimately became a director of business development at Refined Technologies. As such, Williams had access to all Refined Technologies' confidential and proprietary products and methods.

40.     As a condition of his hire, Williams signed an employment agreement on May 10, 2010. This agreement explicitly addressed the receipt and disclosure of confidential trade secret information:

> Section 7.  Receipt and disclosure of confidential information.  Employee acknowledges and agrees that because of his/her position with Employer, the nature of his/her duties and responsibilities and the contact he/she has with the clients of Employer, Employee will acquire valuable information and confidential information and trade secrets with respect to Employer's successful business operations.  For purposes of this agreement, the term "information" includes, by way of example and not limitation, information relating to research, development, patent and copyright development and licensing thereof; trade secrets including but not limited to QuikTurn®, Super Q®, Tidal Wave™, Thunder Storm™, Accelerate™, Permanna®, PetroBlast®, Heat Trax®, Vaporganic® process and inventions; formulas, product blending formulas, designs, drawings, specifications and engineering; laboratory analysis; production processes and equipment; marketing techniques, price lists, pricing policies and quoting procedures; database passcodes; financial information; names of clients and their representatives; client's services; computer techniques, programs and software; and the type, quantity and specifications of products purchased or sold by or from client(s) and/or by or from supplier(s).

41.     The agreement further provided that Williams was not permitted to use any confidential information for his own purposes or for the purposes of any person other than Refined Technologies, and that Williams was obligated to forever maintain the confidentiality of the confidential information:

During employment with the Company and thereafter, Employee will not use Confidential Information for his/her own purposes or for the purposes of any person other than the Company and will not disclose Confidential Information to non-Company personnel except as required in connection with his/her duties as an Employee of the Company or with the prior written permission of the Company. Employee agrees to take all reasonable precautions to prevent inadvertent disclosure or use of such Confidential Information. Employee shall forever maintain the confidentiality of such Confidential Information except as to any item or portion thereof that is or becomes publicly known other than through or by him/her. Nothing herein shall preclude Employee from using or disclosing information rightfully disclosed to him/her by a third party not employed by the Company, to the extent allowed by such third party.

42.    Finally, Refined Technologies made it clear to Williams that use of any confidential information in violation of the agreement could be damaging to Refined Technologies' business operations, particularly if a competitor were able to use the information:

In addition, Employee understands the importance of his/her obligation of confidentiality to the Company and acknowledges that the use or disclosure of Confidential Information by him/her could be damaging to the Company business operations, particularly if such use or disclosure is by or to a competitor of the Company. If Employee should ever accept employment from, or provide consulting services to, a competitor of the Company, he/she will not use or permit the use of Confidential Information for the benefit of such competitor.

43.    Williams left Refined Technologies around November 2014. Subsequently, he began working for Farr Front Chemical Services, a company which has marketed itself as providing guidance for "the de-inventorying and chemical decontamination process for refinery and petrochemical unit shutdowns." On information and belief, Farr Front was founded in 2015, and was also a competitor to Refined Technologies. On information and belief, Williams was a national account sales manager for Farr Front.

44.    On information and belief, DeBusk acquired Farr Front in September 2021. On information and belief, Williams is currently employed directly by DeBusk, and holds the position of "General Manager Unit Clearing."

### 3.    Ryan Ulferts

45.    Refined Technologies hired Ryan Ulferts in September 2019. Prior to working for Refined Technologies Williams had experience working in petroleum refining and chemical plants, but on information and belief had no refinery or chemical decontamination experience. As part of his employment, Refined Technologies fully trained Ulferts in every technical aspect of the business, including but not limited to the confidential and proprietary trade secret information related to implementation of the decontamination processes described in the '488 Patent. Ulferts acted as a General Manager for Refined Technologies in Chicago, assigned to the Midwest, Northeast, and Great Lakes territories. As such, Ulferts had access to all Refined Technologies' confidential and proprietary products and methods.

46.    As a condition of his hire, Ulferts signed a confidentiality agreement on September 9, 2019.  This agreement explicitly addressed the receipt and disclosure of confidential trade secret information:

In connection with Employee's employment with the Company, Employee shall be provided access to confidential know-how, techniques, programs, trade secrets, and other Confidential Information of the Company. If Employee currently is employed, or was previously employed by the Company, such access shall include additional Confidential Information and training and continued access to Confidential Information and training previously provided, which otherwise would not be provided. The unauthorized disclosure or use of Confidential Information to or by any person or entity would cause the Company substantial and irreparable damage.

47.    The agreement defined Confidential Information:

5.3.    "Confidential Information" shall mean the confidential information, trade secrets, and other proprietary information of the Company that the Company takes steps to maintain as confidential and which is not in the public domain, including, but not limited to, research, technological developments, patent and copyright developments and licensing, trade secrets including but not limited to QuikTurn®, QuikTurnRX®, Quench®, Super Q®, UpperCut®, Permanna®, PetroBlast®, Heat Trax®, Vaporganic®, Strategic Chemistry®, confidential or proprietary processes for catalyst change, crude unit cleaning, flare drum cleaning, heat exchanger cleaning, cleaning heat exchangers prior to pulling, reformer reactor system, and steam cracking fractionator cleaning, and associated process and inventions, formulas, product-blending formulas, designs, drawings, specifications and engineering, laboratory analysis, production equipment, techniques, processes, methods, know-how, plans for new business ventures and products, technical and non-technical data, business and marketing strategies, business projections, client lists, customer contact information, referral source contact information, customer purchase information, pricing policies and quoting procedures, price lists, methods of production, database passcodes, supply sources, compilations of client information, computer techniques, programs and software, the type, quantity and specifications of products purchased or sold by or from clients and/or suppliers, contracts with third parties, training, financial and marketing books and data, details or provisions of any written or oral contract or understanding between the Company and any third party, any information derived from Company Property, sales projections, internal employer databases, reports, forms, and manuals, including those documents and items that the Employee may develop or help develop while in the Company's employ, whether or not copied, duplicated, computerized, handwritten, or in any other form, and all information contained therein.

48.    The agreement further provided that Ulferts was not permitted to use any confidential information for his own purposes or for the purposes of any person other than Refined Technologies, and that Ulferts was obligated to forever maintain the confidentiality of the confidential information:

17

    **6.1.**   Non-Use. During the course of Employee's employment with the Company and after Termination, Employee covenants and agrees that Employee will not use the Confidential Information for the benefit of Employee or any Person other than the Company, in whole or in part, in any manner either directly or indirectly; Employee shall not, without the prior written consent of the Company, which consent may be withheld in the Company's sole and absolute discretion, use for Employee's own benefit or purposes, any Confidential Information;

    **6.2.**   Non-Disclosure. During the course of Employee's employment with the Company, Employee covenants and agrees that Employee will keep the Confidential Information in the strictest confidence, and share it with Persons only for the benefit of, and with the express authorization of, the Company. Moreover, from and after Termination, Employee will not disclose any Confidential Information, in whole or in part, in any manner either directly or indirectly, to any Person other than the Company.

49.    Finally, Refined Technologies made it clear to Ulferts that use of any confidential information in violation of the agreement could be damaging to Refined Technologies' business operations, including irreparable injury:

    **7.2.**   Employee acknowledges and agrees that, any violation by Employee of the confidentiality provisions contained in this Agreement would result in irreparable injury to the Company. Accordingly, if Employee violates the confidentiality provisions contained in this Agreement, then Employee agrees that the Company shall be authorized and entitled to obtain, from any court of competent jurisdiction, preliminary and permanent injunctive relief, as well as an equitable accounting of all profits and benefits arising out of such violations, which rights and remedies shall be cumulative and in addition to any right and remedy to which the Company shall be entitled.

50.    The agreement further included Ulfert's consent to the personal jurisdiction of the courts in Texas for any lawsuit arising from or related to the agreement, whether based on contract law or any other cause of action:

    **11.2.**   Governing Law. This Agreement and all questions relating to its validity, interpretation, performance and inducement shall be governed by, construed, interpreted, and enforced in accordance with the substantive laws of the State of Texas, without reference to any choice-of-law principles. The Parties expressly consent to the personal jurisdiction of the appropriate state and federal courts located in the State of Texas for any lawsuit arising from or related to this Agreement of Employee's employment with the Company. The Parties expressly warrant that jurisdiction in the appropriate state and federal courts located in the State of Texas is mandatory, that any lawsuit under this agreement shall proceed in the State of Texas alone and not any other jurisdiction, and that Texas is the exclusive forum and venue for litigation arising under this agreement, including causes of action sounding in contract law and all other causes of action.

51.     Ulferts left Refined Technologies around June 2021, whereupon he immediately began work for DeBusk. On information and belief, he is currently a Vice President of Catalyst Operations for DeBusk in the Chicago area.

### C.     DeBusk's Infringing Process

52.     DeBusk offers various services including reactor treatment processes involving chemical cleaning and removal of LELs, $H_2S$, and benzene from high pressure catalyst reactors. For example, DeBusk prominently advertises and touts these processes as "patented technology" on LinkedIn (www.LinkedIn.com):





53.     Although Refined Technologies does not have access to DeBusk's internal documents and procedures regarding exactly how it implements its processes, DeBusk has confirmed in writing that the '239 Patent describes DeBusk's relevant processes.

54.     DeBusk's treatment process thus includes the steps of "isolating the reactor system to be treated from upstream and downstream equipment; reducing the temperature and pressure of the isolated reactor system by flushing with a hydrogen rich gas; [and] injecting a non-aqueous liquid solvent into the reactor system at an injection point while continuously flowing hydrogen-rich gas through the reactor system." '239 Patent, Abstract.

55.     The '239 Patent also states that the patented method includes the step of "maintaining the solvent in a liquid state while flowing the solvent continuously through

the reactor system." *Id.* The solvents used in DeBusk's process may be one or more of benzene, toluene, xylene, and chemical derivatives thereof. *Id.*, 2:57-59.

56.     However, on information and belief, DeBusk's actual treatment process does not and cannot maintain the solvent in a "liquid state" while flowing the solvent continuously through the reactor. This is because the '239 Patent provides that its process includes injecting the liquid solvent while maintaining the reactor temperatures in the range of 300 to 500°F and the reactor pressures from 200 to about 500 psig, as discussed further below. Assuming the specified process conditions and steps are followed, the solvents cannot be in a liquid state while utilizing DeBusk's process. Rather, all or substantially all the solvent DeBusk injects into the reactor system is vaporized after injection and while inside the reactor system. These treatment processes shall be referred to as the "Accused Methods" hereafter.

## The Accused Methods

57.     On information and belief, the Accused Methods meet all the elements of at least one claim of the '488 Patent, including exemplary claim 1, either literally or under the doctrine of equivalents.

58.     The Accused Methods include removing a contaminant from a process system. *See* '239 Patent, Abstract ("There are provided methods of treating a catalyst-containing reactor system with a liquid solvent to remove contaminants from the reactor system.").

59.    The Accused Methods include the step of providing a carrier gas, pumped from a gas source into a process system. '239 Patent, 5:37-43 ("[T]he system is flushed with a hydrogen-rich purge gas, which is almost always continuously flowing through the reactor system during preceding steps 212-222."). The carrier gas is water free as that term is used in the '488 Patent, because refinery hydrogen streams are dried to remove water, which is poisonous to the catalyst.

60.    The Accused Methods include the step of providing a non-aqueous solvent source. *See* '239 Patent, Abstract ("An exemplary method includes the steps of: . . . injecting a non-aqueous liquid solvent into the reactor system at an injection point . . . ."), 2:49-59 ("An exemplary method may also utilize a solvent includes aromatic components, such as xylene as the non-aqueous liquid solvent. . . . An exemplary method may include a liquid solvent selected from any one or more of benzene, toluene and xylene, and chemical derivatives thereof.").

61.    The Accused Methods include the step of volatilizing non-aqueous solvent from the non-aqueous solvent source in water-free carrier gas from the carrier gas source and delivering the carrier gas containing the volatilized non-aqueous solvent to the process system. In the Accused Methods, when the non-aqueous solvent is pumped into the process system having the flowing water-free carrier gas, the solvent volatilizes in the carrier gas. The carrier gas containing the volatilized solvent is delivered to the process system.

62.    Although the '239 Patent claims that "the solvent is to be injected and maintained in a liquid state," it also states that this "is a function of both temperature and pressure in that a higher temperature can be used if the pressure is higher to maintain a

22

liquid phase," and further that "in exemplary embodiments, temperatures may range from about 300 to about 500° F and pressures may range from about 200 to about 500 psig may be usefully applied in the reactor system [sic]." '239 Patent, 5:4-30. However, using the specified exemplary solvents (benzene, xylene, and toluene) and the cited temperatures and pressures, along with the process description as a whole, all or substantially all the non-aqueous solvent will be volatilized (i.e., vaporized) once injected into the hydrogen-rich (water-free) carrier gas. This combined gas and vaporized solvent stream is delivered to the reactor (the process system). '239 Patent, 5:16-43. ("The non-aqueous solvent is in a liquid phase as charged to the reactor system. . . . The solvent may be continuously injected for flushing into the reactor system in step 220 for a period of from about 1 to about 4 hours. . . . a hydrogen-rich purge gas . . . is almost always continuously flowing through the reactor system during preceding steps 212-222."); *see also id.*, Abstract ("An exemplary method includes the steps of: . . . injecting a non-aqueous liquid solvent into the reactor system at an injection point while continuously flowing hydrogen-rich gas through the reactor system . . . .").

63.    The Accused Methods include the step of removing said contaminant out of the system, wherein a substantial amount of the contaminant is dissolved in the solvent in a vapor or liquid state as it is being removed from the system. '239 Patent, 2:26-43 ("In an exemplary embodiment there is provided a method of treating a catalyst-containing reactor system with a liquid solvent to remove contaminants, such as but not limited to LEL (lower explosive limit substances), H2S, benzene, VOCs (volatile organic compounds), gums and like substances that cause increased pressure drop across the reactor system and/or cause

loss of catalyst effectiveness. . . . The method includes . . . removing contaminants from the reactor system, while a hydrogen-rich gas also flows through the system."); *id.* at 4:7-13 ("The present technology, as described in more detail below, utilizes a non-aqueous liquid solvent . . . to strip the contaminants from the catalyst, so that it can either be reused as regenerated catalyst or removed as spent catalyst and replaced with fresh catalyst."). Based on this description of the Accused Methods, a person of ordinary skill in the art would understand that the contaminants would be dissolved in the solvent in its vapor phase as it is removed from the reactor system.

## COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 9,017,488 (DEFENDANT DEBUSK)

64.     Refined Technologies repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth here.

65.     DeBusk has directly infringed and continues to directly infringe the '488 Patent, in violation of 35 § U.S.C. 271(a) by making, using, selling, and/or offering to sell in the United States the Accused Methods, which include the elements claimed in or equivalent to the '488 Patent as described above, including at least claim 1 of the '488 Patent.

66.     On information and belief, DeBusk has offered to sell and has sold the Accused Methods and intends to use, and/or induce others to use them, during an upcoming turnaround on reactors located at a large refinery in Galveston County, Texas in the third quarter of 2022.

67.     Further, on information and belief, separate and apart from its infringement related to the aforementioned turnaround, DeBusk makes or uses, has offered to sell, has

sold, and/or has induced others to use the Accused Methods within the United States as of the date of this Complaint.

68.    On information and belief, DeBusk has directly infringed at least one claim of the '488 Patent in violation of 35 U.S.C. § 271 *et seq.*, by making, using, offering for sale, and selling in the United States without authority the Accused Methods. To perform the Accused Methods, DeBusk may direct the customer, typically the plant operator, to perform one or more actions. However, DeBusk maintains full control over the manner and timing of the infringing steps, including any actions by the customer.

69.    In addition to and/or in the alternative to the foregoing, DeBusk has indirectly infringed at least one claim of the '488 Patent in violation of 35 U.S.C. § 271 *et seq.* With prior knowledge of the '488 Patent, DeBusk directs, causes, instructs, and/or encourages its customers to perform the Accused Methods, knowing that the Accused Methods constitute infringement of at least claim 1 of the '488 Patent. More specifically, as detailed further below, DeBusk was aware that the Accused Methods infringed the '488 Patent. Despite this, on information and belief, DeBusk has and is providing detailed instructions, support, and technical assistance to its customers to enable those customers to practice the Accused Methods.

70.    Moreover, DeBusk's infringement of the '488 patent has been and continues to be willful. On information and belief, DeBusk has been on notice of the '488 Patent since at least February 2021, when it acquired Kixmon. Kixmon was the original applicant for the '239 Patent, which has been assigned to DeBusk. The only named inventor of the '239 Patent, Defendant Montgomery, was a principal for Kixmon and upon that company's

acquisition by DeBusk, an employee of DeBusk. Montgomery is also a former employee of Refined Technologies. In that capacity, he had actual knowledge of the contents of the '488 Patent.

71.    Further, even if DeBusk were not aware of the '488 Patent upon its hiring of Montgomery in February 2021, it was aware of the '488 Patent no later than April 2021, when Refined Technologies requested that DeBusk explain how its process did not infringe the '488 Patent.

72.    Despite DeBusk's knowledge of the '488 Patent, DeBusk proceeded to make, use, offer to sell, and sell, and/or induce others to use the Accused Methods. In doing so, DeBusk either had knowledge of, or was willfully blind to, the fact that the Accused Methods constituted infringement of the '488 Patent. DeBusk's knowledge and/or willful blindness are shown by the fact that, under the process description and conditions specified in the '239 Patent and utilized by DeBusk, all or substantially all the specified non-aqueous solvent used in the Accused Methods will be volatilized, thereby infringing at least claim 1 of the '488 Patent. This fact would have been readily known and apparent to a person of ordinary skill in the art.

73.    Further, on information and belief, in the '239 Patent, DeBusk and/or its predecessor in interest (Kixmon and/or Montgomery) knowingly and willfully misrepresented that the non-aqueous solvent will remain in liquid form, in order to conceal its infringing activities.

74.     DeBusk's acts of infringement have caused damage to Refined Technologies, and Refined Technologies is entitled to recover from DeBusk the damages it has sustained as a result of DeBusk's wrongful acts, in an amount subject to proof at trial.

75.     Further, DeBusk's infringement of Refined Technologies' exclusive rights under the '488 Patent has caused and will continue to cause Refined Technologies irreparable harm for which there is no adequate remedy at law, unless this Court enjoins the infringement.

## COUNT 2: TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT (ALL DEFENDANTS)

76.     Refined Technologies repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth here.

77.     Refined Technologies owns and maintains confidential and proprietary information related to the processes described in the '488 Patent, including but not limited to: sourcing of raw materials (e.g., for solvents); appropriate lab testing methods to validate formulas; criteria for inspecting raw materials prior to blending; compatibility and stability testing methods; distillation and mass balance properties; dosing strategies for determining how much solvent to be used for specific types of equipment; methods for most efficiently performing the steps described in the claims of the '488 Patent; client lists and client contacts; client contract strategy, and sales and pricing strategy (collectively, "Trade Secrets").

78.     The Trade Secrets comprise information that is not generally known or readily ascertainable through proper means by persons who are not subject to confidentiality obligations to Refined Technologies. The Trade Secrets are of significant competitive value to Refined Technologies because they are not generally known. Further, the Trade Secrets relate to Refined Technologies' reactor decontamination process, which is offered nationwide and is within the flow of interstate commerce.

79.     Refined Technologies has taken and continues to take reasonable measures to protect the confidentiality of its Trade Secrets. For example, employees are required to sign an agreement upon beginning their employment at Refined Technologies. The agreement includes a confidentiality provision that restricts the employee's ability to access and use Refined Technologies' confidential information, including the Trade Secrets, and wherein the employee promises to maintain the confidentiality of that information. Refined Technologies also enters into non-disclosure agreements with customers and potential customers before Refined Technologies shares its confidential and proprietary documents and materials with these third parties. Refined Technologies also takes additional steps to protect the Trade Secrets, such as stamping copies of documents containing Trade Secrets with appropriate labels indicating the confidential and proprietary nature of the information.

80.     Refined Technologies derives independent economic value from maintaining its Trade Secrets as confidential and proprietary. For example, the solvent dosing strategies for particular refinery units were not known by Refined Technologies' competitors and therefore set Refined Technologies apart in the marketplace and provided Refined

Technologies with a competitive advantage in making and winning bids for such projects. Refined Technologies' competitors would gain significant economic value from the disclosure or use of Refined Technologies' Trade Secrets.

81.    Defendants Montgomery, Williams, and Ulferts (the Individual Defendants) had access to the Trade Secrets when they worked for Refined Technologies.

82.    On information and belief, the Individual Defendants misappropriated Refined Technologies' Trade Secrets because they have disclosed and used the Trade Secrets without Refined Technologies' consent, having used improper means to obtain them. In particular, and on information and belief, in using Refined Technologies' Trade Secrets in connection with their work for DeBusk, the Individual Defendants breached their agreements with Refined Technologies. As part of these agreements, these defendants acknowledged a continuing obligation to maintain the confidentiality of Refined Technologies' trade secret and proprietary information. Despite acknowledging these obligations, on information and belief these defendants have provided this information to DeBusk and further used the Trade Secrets to the benefit of DeBusk in performing their job responsibilities for DeBusk. For example, the Individual Defendants knew Refined Technologies' pricing approach and, upon information and belief, have since joining DeBusk been marketing DeBusk's services by representing to clients that they can "do what Refined Technologies does but for half the price."

83.    DeBusk economically benefited from the Trade Secrets provided by the Individual Defendants. In addition, on information and belief, in their use of Refined Technologies' trade secrets, the Individual Defendants were subject to the oversight and

under the control of others within DeBusk, including at least their immediate supervisors. In addition, executives within DeBusk had the ability to supervise and exercise control over the work performed by the Individual Defendants on behalf of DeBusk. DeBusk is therefore liable for the trade secret misappropriation performed by its employees (the Individual Defendants) under at least the doctrine of *respondeat superior*.

84.    In addition, or in the alternative, on information and belief DeBusk also misappropriated Refined Technologies' Trade Secrets because DeBusk acquired the Trade Secrets from the Individual Defendants, and either knew or had reason to know that the information provided by the Individual Defendants included and/or was based on Refined Technologies' Trade Secrets and was acquired by theft or breach of the Individual Defendants' respective duties to maintain secrecy. For example, on information and belief, DeBusk submitted bids and bid information for jobs (in competition with Refined Technologies) based on Refined Technologies' Trade Secrets, provided directly or indirectly by the Individual Defendants. DeBusk thus knew or should have known that these bids included information beyond that available to DeBusk before it hired the Individual Defendants. DeBusk also knew that the Individual Defendants had previously worked at Refined Technologies before coming to work for DeBusk and would have acquired Refined Technologies' confidential information under circumstances giving rise to a duty to maintain the secrecy of the information. Accordingly, DeBusk knew or should have known that its bids and bid information was derived from or otherwise contained Refined Technologies' Trade Secrets, and that such trade secret information was obtained without authorization and through improper means from Refined Technologies.

85.    On information and belief, Defendants have willfully and maliciously misappropriated the trade secrets of Refined Technologies and used them for their economic gain.

86.    Refined Technologies has been harmed, and Defendants have been unjustly enriched, by Defendants' actions. For example, Refined Technologies has suffered actual damages in an amount to be proven at trial. These damages include but are not limited to the loss of bids to DeBusk, where DeBusk has submitted bids incorporating Refined Technologies' Trade Secrets but without reflecting the costs born by Refined Technologies in developing them. Moreover, Defendants have gained an improper competitive advantage over Refined Technologies that has caused or may cause Refined Technologies to lose business that it would have otherwise obtained.

87.    Defendants' ongoing and continuing use of Refined Technologies' proprietary, confidential trade secret information has caused, and will cause, Refined Technologies repeated and irreparable injury.

88.    Refined Technologies' remedy at law is not, by itself, adequate to compensate Refined Technologies for the injuries already inflicted and further threatened by Defendants.

89.    Refined Technologies has been damaged by all the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

90.    By engaging in the conduct set forth above, Defendants have violated the Defend Trade Secrets Act, 18 U.S.C. § 1836.

## COUNT 3: TRADE SECRET MISAPPROPRIATION UNDER THE TEXAS UNIFORM TRADE SECRET ACT
## TEX. CIV. PRAC. & REM. CODE § 134A.001 ET SEQ.
## (ALL DEFENDANTS)

91.     Refined Technologies repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth here.

92.     Defendants have misappropriated Refined Technologies' Trade Secrets in violation of the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq*.

93.     Refined Technologies' Trade Secrets contain information that is not generally known or readily ascertainable through proper means by persons who could use it for economic gain. This information contained in the Trade Secrets is of significant competitive value to Refined Technologies because it is not generally known.

94.     Defendants' ongoing and continuing use of Refined Technologies' proprietary, confidential trade secret information has caused, and will cause, Refined Technologies repeated and irreparable injury. Refined Technologies' remedy at law is not, by itself, adequate to compensate Refined Technologies for the injuries already inflicted and further threatened by Defendants.

95.     The Defendants have willfully and maliciously misappropriated trade secrets of Refined Technologies and used them for their economic gain.

96.     Refined Technologies has been damaged by all the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

32

97.    By engaging in the conduct set forth above, Defendants have violated the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001 *et seq.*

## DEMAND FOR JURY TRIAL

98.    Refined Technologies demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Refined Technologies prays for the following relief:

A.  A judgment that DeBusk has directly infringed the '488 Patent;

B.  A judgment that DeBusk has induced infringement of the '488 Patent;

C.  An award of monetary damages arising out of DeBusk's infringement of the '488 Patent;

D.  An order declaring that DeBusk's infringement has been willful and increasing the damages awarded to Refined Technologies up to three times the amount found or assessed, pursuant to 35 U.S.C. § 284;

E.  An order finding that this case is exceptional within the meaning of 35 U.S.C. § 285 and awarding Refined Technologies its attorneys' fees;

F.  An order enjoining DeBusk, its officers, agents, employees, and those persons in active concert or participation with any of them, and its successors and assigns, from infringement or inducement of infringement of the '488 Patent, including but not limited to making, using, selling and/or offering for sale within the United States any methods that infringe the '488 Patent before the expiration of the '488 Patent;

G.  A judgment that Defendants have committed acts of willful and malicious trade secret misappropriation in violation of the DTSA, 18 U.S.C. § 1836;

H.  A judgment that Defendants have committed acts of willful and malicious trade secret misappropriation in violation of the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001 *et seq.*;

I.  A permanent injunction enjoining Defendants from continuing to use, possess, or disclose Refined Technologies' trade secret information;

J.  An order for an accounting and report by Defendants of all Refined Technologies' trade secret information or material of any type in Defendants' possession;

K.  An order for the return to Refined Technologies of all Refined Technologies trade secret information and all Refined Technologies material that contain trade secret information in Defendants' possession.

L.  An award of monetary damages under 18 U.S.C. § 1836 to Refined Technologies for Defendants' misappropriation of Refined Technologies' trade secret information, including but not limited to damages for actual loss caused by the misappropriation, damages for unjust enrichment caused by the misappropriation, or in the alternative a reasonable royalty;

M.  An award of exemplary damages under 18 U.S.C. § 1836 to Refined Technologies for Defendants' willful and malicious misappropriation of Refined Technologies' trade secret information;

N.  An award of monetary damages under Tex. Civ. Prac. & Rem. Code §§

134A.001 *et seq.* to Refined Technologies for Defendants' misappropriation of Refined Technologies' trade secret information, including but not limited to damages for actual loss caused by the misappropriation, damages for unjust enrichment caused by the misappropriation, or in the alternative a reasonable royalty;

O. An award of exemplary damages under Tex. Civ. Prac. & Rem. Code §§ 134A.001 *et seq.* to Refined Technologies for Defendants' willful and malicious misappropriation of Refined Technologies' trade secret information;

P. An order awarding Refined Technologies prejudgment and post-judgment interest on its damages;

Q. an order awarding Refined Technologies its costs;

R. An order awarding Refined Technologies any other and further relief as the Court deems proper.

Respectfully submitted,

*/s/ James H. Hall*

**James H. Hall**
*Attorney-in-charge*
Texas Bar No. 24041040
S.D. Texas I.D. No. 36,904
Email: James@CHZFirm.com
**J. David Cabello**
Texas Bar No. 03574500
S.D. Texas I.D. No. 3514
Email: David@CHZFirm.com
**William C. Slusser**
Texas Bar No. 18514500
S.D. Texas I.D. No. 1068
Email: Bill@CHZFirm.com
**Stephen Zinda**
Texas Bar No. 24084147
S.D. Texas I.D. No. 1,692,382
Email: Stephen@CHZFirm.com
**Munira A. Jesani**
Texas Bar No. 24101967
S.D. Texas I.D. No. 3,019,538
Email: MJesani@CHZFirm.com

CABELLO HALL ZINDA, PLLC
801 Travis Street, Suite 1610
Houston, TX 77002
Tel.: 832.631.9990
Fax: 832.631.9991

ATTORNEYS FOR PLAINTIFF
**Refined Technologies, INC.**